# IN THE SUPREME COURT OF TEXAS

═══════════

No. 17-0552

═══════════

TEXAS DEPARTMENT OF CRIMINAL JUSTICE, PETITIONER,

v.

MAURIE LEVIN, NAOMI TERR, AND HILARY SHEARD
RESPONDENTS

═══════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS

═══════════════════════════════

**Argued January 23, 2019**

JUSTICE GREEN delivered the opinion of the Court.

JUSTICE GUZMAN and JUSTICE BLACKLOCK did not participate in the decision.

In this case, we again consider whether the public's right to information under the Texas Public Information Act (PIA) is subject to reasonable limitations when its production may lead to physical harm. *See Tex. Dep't of Pub. Safety v. Cox Tex. Newspapers, LP*, 343 S.W.3d 112, 114–15, 118 (Tex. 2011) (recognizing a common law exception to mandatory public disclosure under the PIA when disclosing the information would create a substantial threat of physical harm). The information sought in this case is the source of drugs used in Texas executions by

lethal injection. We conclude, based on the evidence in the record, that disclosing the source's identity would create a substantial threat of physical harm to the source's employees and others, and therefore need not be disclosed. Accordingly, we reverse the court of appeals' judgment and render judgment for the Texas Department of Criminal Justice (the Department), the entity withholding the information.

## I. Background

Maurie Levin, Naomi Terr, and Hilary Sheard (collectively, Levin) represent capital defendants on death row. Concerned with the possibility of mismanaged executions by lethal injection, Levin made the following written requests to the Department under the PIA:

(1)     the execution protocol by which [Texas] intend[s] to carry out . . . scheduled execution[s],

(2)     the drug or drugs, including back-up, [Texas] intend[s] to use,

(3)     the source of those drugs, . . .

(4)     the date [the drugs were] ordered and received, and

(5)     any testing conducted to ensure potency, purity, and integrity.

The Department eventually released all information except the specific identity of the pharmacy or pharmacist that compounded the drugs—that is, the drugs' source. The Department would divulge only that the unnamed pharmacy is a licensed compounding pharmacy open to the public and located in an urban area of a Texas city.

To support withholding the source's identity and in accordance with Texas Government Code section 552.301, the Department requested a ruling from the Attorney General that the

2

source's identity could be withheld from public disclosure, relying in part on the common law PIA exception that reflects individuals' interest in being free from physical harm. *See* TEX. GOV'T CODE § 552.301 (requiring the government to seek an opinion ruling from the Attorney General if the governmental body believes the requested information is excepted from disclosure, and if there has been no previous determination on the subject); *Cox*, 343 S.W.3d at 114–15, 118 (explaining that information can be withheld if public disclosure "would subject the employee or officer to a substantial threat of physical harm" (citation omitted)). The Attorney General agreed and ruled that the physical-safety exception in *Texas Department of Public Safety v. Cox Texas Newspapers, LP* applied and protected the identifying information from disclosure. *See* Tex. Att'y Gen. OR2014-09184, at 2–3 (applying *Cox*, 343 S.W.3d at 118).

Undeterred, Levin petitioned the trial court for relief. The parties presented the merits through competing summary judgment motions, and the Department offered three pieces of evidence, along with expert testimony and other supporting evidence, to demonstrate a substantial threat of physical harm if the source of the drugs were to be disclosed: (1) comments on the website of a previous supplier of lethal injection drugs—the Woodlands Pharmacy—and emails sent to the owner of that pharmacy; (2) a blogger's post about capital punishment related to the Woodlands Pharmacy; and (3) a professor's email to a pharmacy in Oklahoma regarding its sale of lethal injection drugs. The trial court found the Department's evidence lacking and agreed with Levin that there was no substantial threat of physical harm.

The court of appeals affirmed the trial court's judgment, concluding that the Department's summary judgment evidence presented mere isolated threats that, without more,

3

amounted to nothing but speculation that disclosure of the source's identity would necessarily give rise to a substantial—that is, more likely than not—threat of physical harm. 520 S.W.3d 225, 240 (Tex. App.—Austin 2017, pet. granted).

While the case was pending before the court of appeals, the Legislature enacted an additional exception to the PIA that makes confidential the identity of any person or entity that provides drugs used for lethal injection to the State of Texas. *See* Act of May 19, 2015, 84th Leg., R.S., ch. 209, § 1, sec. 552.1081, 2015 Tex. Gen. Laws 1286, 1287 (codified at TEX. GOV'T CODE § 552.1081) (excluding from disclosure "any person or entity that manufactures, transports, tests, procures, compounds, prescribes, dispenses, or provides a substance or supplies used in an execution"). The amendment is prospective only and does not control the merits of this case. *See* Act of May 19, 2015, 84th Leg., R.S., ch. 209, § 3, 2015 Tex. Gen. Laws 1286, 1287.

The Department petitioned this Court for review, and we granted the petition. 62 Tex. Sup. Ct. J. 74 (Oct. 19, 2018).

## II. Analysis

### A. The Public Information Act

The PIA embodies a powerful policy that "each person is entitled, unless otherwise expressly provided by law, at all times to complete information about the affairs of government and the official acts of public officials and employees." TEX. GOV'T CODE § 552.001(a). This doctrine is central to "the American constitutional form of representative government that adheres to the principle that government is the servant and not the master of the people." *Id.*

4

The Legislature reinforces this fundamental philosophy through a broad mandate that the PIA "shall be liberally construed in favor of granting a request for information." *Id.* § 552.001(b). This is because the people, "in delegating authority, do not give their public servants the right to decide what is good for the people to know and what is not good for them to know. The people insist on remaining informed so that they may retain control over the instruments they have created." *Id.* § 552.001(a).

Although we have recognized the PIA's broad and liberal applicability favoring disclosure, *see generally Jackson v. State Office of Admin. Hearings*, 351 S.W.3d 290, 292 (Tex. 2011), we have also held that "liberal construction" under the PIA "is not tantamount to boundless reach." *Greater Hous. P'ship v. Paxton*, 468 S.W.3d 51, 67 (Tex. 2015). Indeed, the Legislature has enacted more than fifty exceptions to the broad rule of disclosure. *See generally* TEX. GOV'T CODE §§ 552.101–.158. Among these exceptions is section 552.101, which excepts "information considered to be confidential by law, either constitutional, statutory, or by judicial decision." *Id.* § 552.101. "[I]nformation considered to be confidential . . . by judicial decision" has the effect of incorporating protections from the common law. *See generally Indus. Found. of the S. v. Tex. Indus. Accident Bd.*, 540 S.W.2d 668, 681–83 (Tex. 1976) (holding that there is a common law right to privacy that protects against PIA disclosure in some circumstances). Relevant to our discussion here is the common law interest in freedom from physical harm, which extends to every person. *See Cox*, 343 S.W.3d at 115 ("Freedom from physical harm is . . . a hallmark of our common law."). This common law exception to the PIA's disclosure

requirements as recognized in *Cox* makes information confidential when disclosure would create a substantial threat of physical harm.  *See id.*

In the case before us, the parties agree that the identity of the source that supplies drugs used in state executions by lethal injection is subject to PIA disclosure unless the Department, as the governmental body resisting disclosure, proves that the *Cox* physical-safety exception justifies non-disclosure.  The parties argue no other statutory or common law exception to the PIA's mandatory disclosure requirements.  Before considering the evidence, however, we review the *Cox* physical-safety exception and its applicability, as neither the parties nor the court of appeals agree on the correct interpretation of the exception.

## B.  The *Cox* Physical-Safety Exception

The procedural posture here matches that of *Cox*.  *Cox* addressed a request from newspapers to the Texas Department of Public Safety (DPS) for the disclosure of travel expense vouchers relating to Governor Rick Perry's security detail.  *Id.* at 113.  DPS declined to produce the documents and sought a ruling from the Attorney General that the requested documents were excepted from disclosure.  *Id.*  In place of the requested documents, DPS offered to release aggregated expense information, arguing that release of the actual vouchers would reveal the number of officers traveling with the governor and would be valuable information for someone intending to cause harm to the governor.  *Id.*  The Attorney General agreed and determined that release of the information would place the governor in imminent threat of physical danger, concluding that the information was excepted from disclosure because of a "special circumstances" aspect of common law privacy.  *Id.*

6

The newspapers in *Cox* sued to compel disclosure. *Id.* The trial court agreed with the newspapers and ordered disclosure, finding that release of the information would not put any person in imminent threat of physical danger or create a substantial risk of serious bodily harm from a reasonably perceived threat. *Id.* The court of appeals affirmed. *Id.*

We granted review in *Cox* "to examine whether the public's right to information is subject to reasonable limitations when its production may lead to physical harm." *Id.* at 114. The answer, we concluded, was that the common law protects information that, if disclosed, would create a substantial threat of physical harm. *Id.* at 118. Noting that "[b]oth the legislative and executive branches have recognized that, as valuable as the right to public information is, a person's physical safety supersedes it," we then fashioned "the appropriate standard for assessing whether disclosure would violate that interest" in physical safety. *Id.* at 117–18. In doing so, we observed that the Legislature had enacted an exception to mandatory disclosure under the PIA just five days after the court of appeals issued its decision. *See* Act of May 27, 2009, 81st Leg., R.S., ch. 283, § 4, sec. 552.151, 2009 Tex. Gen. Laws 742, 743 (amended 2011) (codified at TEX. GOV'T CODE § 552.152). That statutory exception provides:

> Information in the custody of a governmental body that relates to an employee or officer of the governmental body is excepted from the requirements of Section 552.021 if, under the specific circumstances pertaining to the employee or officer, disclosure of the information would subject the employee or officer to a substantial threat of physical harm.

TEX. GOV'T CODE § 552.152. We noted that "[w]hile we are not bound by the Legislature's policy decisions when we consider protections afforded by the common law, 'the boundaries the Legislature has drawn do inform our decision.'" *Cox*, 343 S.W.3d at 118 (quoting *Ford Motor*

7

*Co. v. Miles*, 967 S.W.2d 377, 383 (Tex. 1988)). We adopted the Legislature's standard in full, referencing that provision and concluding that the "substantial threat of physical harm standard enunciated by the Legislature appropriately describes the interest protected under the common law, and information may be withheld if disclosure would create a substantial threat of physical harm." *Id.* (internal quotations and citation omitted). We explained further that to determine whether disclosure does in fact pose a substantial threat to physical harm:

> The dividing line between disclosure and restraint must be determined by proof. To the extent DPS can show, with detailed evidence or expert testimony, that revelation substantially threatens harm . . . then the information at issue may be withheld. A certain amount of deference must be afforded DPS officers and other law enforcement experts about the probability of harm, although vague assertions of risk will not carry the day. But the public's right to "complete information" must yield when disclosure of that information would substantially threaten physical harm.

*Id.* at 119 (footnote omitted). We remanded the case to the trial court for further proceedings to determine if disclosure of the requested documents would substantially threaten physical harm to the governor or his security detail. *Id.* at 121.

### C. *Cox*'s Applicability

Although there is no doubt that *Cox* is instructive, we begin by considering the precedential value of *Cox* in this case. *Cox* answered the question of a potential threat of physical harm to a known target—Governor Perry—and, by extension, his security detail. *See id.* at 113. The evidence in *Cox* presented a clear and objective threat to the governor. *See id.* As the court of appeals in this case noted, the supervisor of the governor's security detail, Lieutenant David Armistead, testified that Governor Perry and his family received "file

8

cabinet after file cabinet after file cabinet of threats," including explicit death threats. 520 S.W.3d at 231. DPS had to assign a specific agent to investigate those threats, and there were "stalkers" as well. *See id.* Moreover, Armistead testified that Governor Perry regularly received threats when he traveled, even describing a specific instance when Governor Perry received an explicit death threat by email from an individual who was later determined to be twenty miles from the governor at the time. *See id.* Armistead connected the existence of real and actual threats to Governor Perry to the specific information being withheld from PIA disclosure—the travel vouchers—by establishing that disclosure of the vouchers' contents would, in the context of the documented historical threats to Governor Perry, "compromise the physical safety that the security detail provided the Governor and [his] family." *See id.* at 231–32. He explained that individuals intending to harm a public figure like the governor "would seek information to their tactical advantage, including consistencies and patterns in movements and methods of movements, patterns with security officers, how many are placed, what positions they are, and how far in advance they go to look at a site prior to the protected individual's arrival." *Id.* at 232 (internal alterations and quotations omitted). This sort of information, Armistead maintained, could be discerned from the vouchers. *See id.*

The context here differs in a significant respect—the target of any threats is largely unknown. No one but the Department and the pharmacy itself knows the identity of the source that supplies the lethal injection drugs to the State of Texas. There is no evidence of a history of specific threats to that particular pharmacist or pharmacy because the source's identity has been kept confidential. Likewise, there is no evidence of a known current threat to this source

9

because its identity remains unknown. How, then, can *Cox* apply if there is no evidence of any threat that has been leveled at this specific drug supplier? Thus, the question before us in this case is whether the mere fact that the public knows that the Department is receiving lethal injection drugs from *some* source, whoever it might be, is enough to conclude that a substantial threat of physical harm will come to bear on the source of the drugs if the identifying information is made public. The court of appeals recognized this distinguishing factor, stating that for *Cox* to apply, "[t]he key issue . . . distills to whether a person's manufacturing or supplying of lethal-injection drugs is the sort of activity that 'would create a substantial threat,' within the contemplation of *Cox*, that others will attempt to physically injure or kill the person" if the information is made public. *Id.* at 234.

This question turns on what we meant in *Cox* by "substantial threat of physical harm." The court of appeals took a narrow view of that standard and required a showing that disclosure of the requested information would "give rise to [a] *substantial* (i.e., more likely than not) threat of physical harm." *Id.* at 240. In reaching this conclusion, the court of appeals presented two interpretations of the "substantial" standard:

> [T]he ordinary meaning of "substantial" includes two connotations that could potentially have application in the context of Section 552.152 and the *Cox* standard. The first is "substantial" in the sense of "true" or "real," as opposed to imaginary or speculative. "Truth" or "reality" in the context of our civil justice system is not absolute certainty, but is ordinarily a function of reasonable probability (i.e., it is more likely than not) that a fact exists or will occur. Assuming this meaning of "substantial" along with the ordinary meaning of "threat" (which in this context would denote a person or thing likely to cause damage or danger), disclosure that "would create" or subject a person to "a *substantial* threat of physical harm" would refer to a greater-than-not likelihood that physical harm would occur upon disclosure.

10

The second potential meaning of "substantial" is a more qualitative or comparative sense of "[c]onsiderable in importance, value, degree, amount, or extent," or that which is deemed "material" to the inquiry. Under this reading, disclosure that would create or subject a person to "a *substantial* threat of physical harm" would refer to that which does not necessarily rise to the level of probable harm, but is nonetheless of an amount or extent that is deemed by some measure to matter or merit consideration. An example in the context of threatened physical harm would be a threat that, while not rising to a probability of harm, is nevertheless of a nature or extent that would be deemed to warrant some sort of precautionary measures.

*Id.* at 236–37 (second alteration in original) (footnotes omitted).

The court of appeals chose the former, concluding that "*substantial* threat of physical harm" means the probability of harm, which gives effect to the distinction between actual physical harm and worry or apprehension of harm. *See id.* at 237. In doing so, the court of appeals rejected any sort of balancing test in which the relative threat of harm is weighed against perceived benefits of disclosure because the right to be free from physical harm was absolute. *See id.* Stated differently, "[w]hen disclosure infringes upon a person's physical safety, . . . that interest 'supersedes' the right to public information, and the latter 'must yield when disclosure of that information would substantially threaten physical harm.'" *Id.* at 238 (citing *Cox*, 343 S.W.3d at 117–19; *Tex. Comptroller of Pub. Accounts v. Attorney Gen. of Tex.*, 354 S.W.3d 336, 341 (Tex. 2010)). The court of appeals concluded:

In sum, the measure by which we ascertain the presence of any genuine issue of material fact in the summary-judgment evidence is whether disclosure of the identifying information at issue (i.e., making publicly available the identity of the pharmacy or pharmacist who supplied [the Department] with lethal-injection drugs) would make it probable (i.e., more likely than not) that the pharmacist, pharmacy employees, or others would be physically harmed.

*Id.*

11

According to the Department, however, *Cox* establishes that the common law interest in freedom from physical harm protects state-held information subject to the PIA from public disclosure when such disclosure would risk creating a substantial threat of physical harm. And, according to the Department, a substantial threat of physical harm can be established through evidence connecting the requested information and the harm about which law enforcement has expressed concern. The court of appeals' interpretation, argues the Department, inappropriately narrows the exception by requiring evidence that physical harm will more likely than not result from the disclosure. The Department asserts that *Cox* does not demand such a result, nor does the phrase "substantial threat" in this context support a more-likely-than-not standard.

Levin, on the other hand, takes no position on the court of appeals' interpretation that "substantial" means more likely than not. Instead, Levin argues that the Department bears the burden to establish that the release of certain public information will cause a "substantial threat of physical harm," and that burden cannot be met with vague assertions of risk or concerns that do not involve actual violence to persons. Levin argues that the Department has not met any minimal standard of proof, let alone the burden outlined in *Cox*.

We agree with the Department. We do not quarrel with the court of appeals' conclusion that the probable more-likely-than-not standard seems plausible. *See id.* This is especially true when, as the court of appeals correctly observed, the "*Cox* opinion itself remains virtually [the] only guidance as to the precise scope or meaning of the standard." *Id.* at 233. However, "substantial" as used in *Cox* does not refer to the degree to which harm is likely to occur, but rather, the degree of the potential threat of harm itself. *See Cox*, 343 S.W.3d at 118 (recognizing

12

that the common law protects a person's physical safety, which supersedes the public's right to information).  As we indicated in *Cox*, courts should focus on the connection between the requested information, on the one hand, and the potential threat and magnitude of such harm, on the other.  *See id.*  And as we explained in *Cox*, a law-enforcement expert's assessment as to the probability of harm surrounding a proposed release of information must be afforded a certain amount of deference.  *See id.* at 119 (explaining that information may be withheld if law enforcement "can show, with detailed evidence or expert testimony, that revelation substantially threatens harm," and "[a] certain amount of deference must be afforded . . . [to] law enforcement experts about the probability of harm, although vague assertions of risk will not carry the day").

Moreover, as to the meaning of "threat of physical harm," we agree with the court of appeals that the standard contemplates "physical harm" to a person and does not include economic harm.  *See* 520 S.W.3d at 234.  Nor does the standard contemplate physical harm to property.  Potential loss of business or employment, harm to personal or real property, or other pecuniary considerations do not constitute a substantial threat of physical harm under *Cox* or the physical-safety exception which reflects an individual's interest in being free from physical harm.  *See Cox*, 343 S.W.3d at 114–15, 118.  Thus, those potential consequences of disclosure, while surely very real to the source, do not satisfy the common law standard for an exception to PIA mandatory disclosure.  To satisfy the standard established in *Cox*, the threat must be directed at a person or persons.

We also observe that the Legislature in this case did almost the same thing it did in *Cox*—that is, while the case was pending before the court of appeals, the Legislature enacted

13

section 552.1081, which plainly excludes from disclosure "any person or entity that manufactures, transports, tests, procures, compounds, prescribes, dispenses, or provides a substance or supplies used in an execution." *See* Act of May 19, 2015, 84th Leg., R.S., ch. 209, § 1, sec. 552.1081, 2015 Tex. Gen. Laws 1286, 1287 (codified at TEX. GOV'T CODE § 552.1081). As we have mentioned, the amendment was prospective only and does not control the disposition of this case. But, as we did in *Cox,* we find the Legislature's policy decision valuable and we look to it as informing the more general common law interest in protecting individuals from physical harm, as we discussed in *Cox.* *See Cox*, 343 S.W.3d at 118 ("While we are not bound by the Legislature's policy decisions when we consider protections afforded by the common law, 'the boundaries the Legislature has drawn do inform our decision.'" (quoting *Ford Motor Co.*, 967 S.W.2d at 383)). In enacting section 552.1081, the Legislature decided that the right to public information under the PIA must yield in this context, because that right is superseded by other highly important interests.

In summation, the standard set forth in *Cox* for the common law exception of substantial threat of physical harm applies in this case even though the potential target is unknown. And like *Cox*, whether the requested information is protected by the physical-safety exception turns on the governmental body's evidence of a substantial threat of physical harm. With that in mind, we examine the evidence presented in this case and apply the standard in *Cox*.

### D.  The Department's Summary Judgment Evidence

The outcome of this case turns on the evidence presented by the Department in support of its contention that release of the source's identity would create a substantial threat of physical

harm. Because the parties submitted the merits of the case in the trial court through competing summary judgment motions and the trial court granted Levin's motion but denied the Department's, we review the entire summary judgment record *de novo*. *See Samson Expl., LLC v. T.S. Reed Props., Inc.*, 521 S.W.3d 766, 774 (Tex. 2017). The Department focused its summary judgment proof on three pieces of evidence and expert testimony from law enforcement personnel. If the evidence, viewed in a light most favorable to the Department where reasonable jurors could, produces no genuine issue of material fact and establishes as a matter of law that the *Cox* physical-safety exception applies, then we must reverse the court of appeals' judgment and render judgment for the Department. *See* TEX. R. CIV. P. 166a(c); *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997).

To put the Department's evidence in context, we briefly outline the events presented in the Department's motion for summary judgment:

- In 2013, the identity of the Woodlands Pharmacy, a previous supplier of lethal injection drugs to the State of Texas, was publicly disclosed in response to a PIA request. Thereafter, the Woodlands Pharmacy received a significant amount of hate mail, comments on its website, and negative media attention directed at the pharmacy.

- Following that, the Department's Office of Inspector General (OIG) learned of a protest planned at the Woodlands Pharmacy. OIG employees and local law enforcement officers went to the protest to ensure safety and conduct surveillance and investigation.

15

- Additionally, the Department became aware of a blog post depicting an animated exploding head that contained excoriating comments directed at the Woodlands Pharmacy's compounding pharmacist.

- In January 2014, a professor sent an email to the Apothecary Shoppe in Tulsa, Oklahoma after that pharmacy was disclosed as a possible supplier of lethal injection drugs, suggesting that they beef up security because of the likelihood that someone might drive a truckload of fertilizer up the shop just like the 1995 truck bombing of the federal building in Oklahoma City, which killed more than one hundred people.

- The Department learned of the professor's email to the Tulsa Apothecary Shoppe in February 2014 when the Department was shopping for a new provider of lethal injection drugs.

- Brad Livingston, the Department's then Executive Director, became concerned about the safety of any source that would supply lethal injection drugs based on a number of factors, including the threats and protests directed at both the Woodlands Pharmacy and the Tulsa Apothecary Shoppe, anticipating that there would be a PIA request for the identity of any new supplier.

- Livingston then requested that the Director of DPS, Colonel Steven McCraw, conduct a threat assessment about the threat of physical harm against pharmacies or drug suppliers that might supply lethal injection drugs to the State. The threat assessment would be needed quickly based on potential PIA requests that would occur once the Department purchased the drugs from a new source.

- In addition to the threat assessment conducted by McCraw, the Department retained a threat assessment expert, John Lawrence Cunningham, a retired Secret Service agent, to conduct a comprehensive threat assessment for the purpose of this litigation.

- Both McCraw and Cunningham concluded that there will be a substantial threat of physical harm if the identity of the source is publicly disclosed.

Relying on these events, the Department first points to the "firestorm" of hate mail, protests, and media coverage surrounding the Woodlands Pharmacy, as evidence of a substantial threat of harm. The Woodlands Pharmacy's identity was publicized following a PIA disclosure in 2013. The pharmacy discontinued supplying lethal injection drugs to the State, because, as the compounding pharmacist put it, "Now that the information has been made public, I find myself in the middle of a firestorm." This "firestorm" of hate mail, argues the Department, constitutes detailed evidence demonstrating a substantial threat of physical harm that is directly connected to the identity of the pharmacy providing lethal injection drugs. The Department also points to law enforcement's reaction to the Woodlands Pharmacy "firestorm" as evidence of a substantial threat of harm that is connected to the requested information. That is, the "firestorm" surrounding the disclosure of the Woodlands Pharmacy's identity posed a sufficiently serious threat of harm to prompt the Department's OIG and the Montgomery County Sheriff's office to dispatch officers to observe and provide security at a protest of the pharmacy.

We disagree with the Department's characterization of this evidence. The comments from various individuals on the Woodlands Pharmacy website and the emails sent to its compounding pharmacist involved people espousing their opinions as to capital punishment

17

without any threats of violence.[1]  Further, although the compounding pharmacist stated that he found himself in a "firestorm" of controversy following the disclosure of the Woodlands Pharmacy's identity, the evidence indicates, and the Department admits, that communications from the pharmacist to the Department did not mention violence or concerns for physical safety when the pharmacy decided to stop selling lethal injection drugs to the Department.  Moreover, the Department's experts admitted that one of the issues surrounding disclosure was that "compounding pharmacies typically stop producing execution drugs after being publicly identified as a supplier" due to negative publicity and a concern as to declining sales, which are not considerations under the *Cox* physical-safety exception.  And finally, following disclosure of the identity of the Woodlands Pharmacy, the Department and the county sheriff's office did monitor the location, as the Department indicates, but there was only a single resulting protest (peaceful and lasting about forty-five minutes) with no reported violence or risk of violence.  As we explained, the *Cox* physical-safety exception does not allow information to remain

---

[1]  Some examples of the messages and emails are as follows:

"Did you know you were selling drugs to the Texas Department of Corrections for 'MURDER?'"
"Please consider 'NOT' selling anymore drugs to be used for executions/MURDER!"

"Please mr and mrs who are working in this pharmacy, stop selling drugs to kill HUMAN BEINGS. Our common dignity is concerned:  Thank you."

"As a supplier of the 'killing drug' to [the Department], the integrity of this pharmacy should seriously be questioned.  [The pharmacy owner] was perfectly fine with the transaction as long as he remained anonymous.  So much for that plan, huh?  Hope it was worth the money for you sir.  Shame on you and your pharmacy.  You aren't even worthy of the star I was required to select."

"Where are the morals and ethics in our society?  I understand business as usual, and if a person [is] allergic to certain prescriptions and needed that script compounded to be able to ingest it, then that would be your job, but to compound a drug to be used to kill with or without FDA approval????  It's just wrong all the way around.  [The Department] used you to get what they needed, and you just let them.  You are guilty of murder.  Yes you provided the murder weapon."

confidential for threat of *economic* harm. *See Cox*, 343 S.W.3d at 114–15, 118 (explaining that information can be withheld if public disclosure "would subject the employee or officer to a substantial threat of *physical* harm" (emphasis added) (citation omitted)). Because this evidence does not suggest or implicate physical violence and shows only people expressing their distaste for capital punishment, we conclude that this evidence does not establish that the *Cox* physical-safety exception allows withholding of the source's identity.

Next, the Department points us to the blog post about capital punishment that depicts an animated exploding head, contending that it constitutes detailed evidence of a substantial threat of harm that is connected to the requested information. The blog post, dated October 6, 2013, was uploaded on the internet almost immediately after the identity of the Woodlands Pharmacy was revealed. The post contained this animated graphic:



19

And the post stated: "Meet the pharmacist who sold the medical ethics and shamed his profession for $2,800 . . . ." The Department argues that, like the "firestorm" of emails, this evidence is enough to establish a substantial threat of physical harm.

Even the court of appeals noted that this evidence was "[s]omewhat closer to the mark." 520 S.W.3d at 240. We agree, but we again disagree with the Department's characterization of the evidence. Although the blog post is related to capital punishment, the writer does not mention or intimate violence or threats. The writer instead encourages readers to post a complaint on the Woodlands Pharmacy website, to complain to the American Pharmacist Association about the ethics of capital punishment, and to sign a petition on Change.org. While the Department interprets the graphic image above as evidence of a violent threat, we have no reason to believe that the exploding clay head symbolizes anything other than the sentiment that "my mind is blown," as in "I cannot understand how this is happening" or "this makes no sense," as the title to the accompanying page states: "The Pharmacist who approves the business of killing, but only under the veil of secrecy." This evidence also does not establish that the PIA's physical-safety exception allows non-disclosure.

Finally, the Department draws our attention to an email a professor sent to an Oklahoma pharmacy supplying lethal injection drugs, arguing that it too constitutes detailed evidence of a substantial threat of harm that is connected to the requested information. The email, sent in the weeks before the PIA request in this case, states:

> Seems to me that manufacturing a drug expressly to kill people flies in the face of one of those commandments Moses got from Jehovah on Sinai, but maybe I'm just being old-fashioned. Still, were I you I'd at least want to beef up my security

now that you've been put in the spotlight as a likely supplier and failed to issue a flat denial. As the folks at the federal building can tell you, it only takes one fanatic with a truckload of fertilizer to make a real dent in business as usual. In your place, I'd either swear to the nation that my company didn't make execution drugs of ANY sort, and then make dang sure that's true, or else openly accept the burden of putting my employees and myself at unacceptable (and possibly uninsurable) risk. Just sayin'.

The Department argues that the content of the professor's email, and the extent to which federal and state law enforcement took the email seriously, exceeds what is required to demonstrate a substantial threat of physical harm as a matter of law. The Department states that even the FBI questioned the professor about this email, and that Livingston, the Department's then Executive Director, testified that he considered the email an actual threat.

We note that the professor clarified his remarks in a subsequent email to Levin, stating:

I wanted to make clear that now that it was generally known that the Apothecary Shoppe was in fact supplying such toxins, even if they did not see it as simply wrong, they needed to be aware that many others did, and that some of them might be dangerous to them, their employees, and the surrounding bystanders if even one fanatic (a term nobody ever uses to describe himself, note) with a rudimentary knowledge of improvised explosives chose to go on the attack. I felt, and thought I had made it clear, that they would be reckless not to consider this possibility and to take appropriate action at the very least to protect against it, as I would surely do were I in their place.

. . . .

But I suspect that he and I are the only ones who seriously believe that there is a real risk here, and even then my own belief in it is both conjectural and lacking in the weight of evidence to support it. Nevertheless, I do know that there are extremists in the right-to-life movement who would regard destroying a death drug factory as equally justified with blowing up an abortion clinic or (as one highly intelligent Catholic convert I know put it) bombing the tracks that led to Auschwitz.

21

Although the court of appeals likewise agreed that this evidence was closer to being considered an actual threat of violence, it summarily dismissed this evidence by stating:

> Assuming without deciding that either the blog posting or the [professor's] e-mail can be read to represent an actual threat of physical harm, we cannot conclude that these isolated threats, without more, would support more than mere speculation that disclosure of the identity of another pharmacy, or of the particular Texas pharmacy or pharmacist in question here, would necessarily give rise to the *substantial* (i.e., more likely than not) threat of physical harm that *Cox* requires.

*Id.* (footnote omitted).

Although we agree with the court of appeals about the blog posting, the professor's email is not as easily disposed. Indeed, the Department relied on expert testimony from McCraw (the Director of DPS), Livingston (the Department's then Executive Director), and Cunningham (an expert retained by the Department) to conclude, in part, that the professor's email was a threat, and a serious one at that. Specifically, Livingston based his determination on explicit "threats of harm" that have "certainly escalated in degree and type" in recent times, not vague assertions of risk. And although Livingston relied in part on the blog depicting an animated exploding head, Livingston also referenced the professor's email, which he described as "a very recent threat to a pharmacist and their pharmacy wherein it was threatened to place a truck filled with fertilizer in front of the pharmacy and blow it up." Livingston summarized his assessment of the threat environment and its immediate connection to the identity of the source of lethal injection drugs when he explained why he sought a threat assessment from McCraw. Livingston recognized, based on his own expertise, that the threat environment was "serious." He explained:

22

> [T]here is an immediate, in my view, nexus between when a compounding pharmacy is made public and the immediacy or near[] immediacy of the harassing E-mails and threats—it happened both in this case and in January of 2014 with respect to The Apothecary Shop[pe] in Oklahoma. The day after it was reported that they were the likely supplier of compounded drugs to the Department of Corrections in Missouri, a very significant and real threat—threatening E-mail was sent.

In addition, Livingston operated under the reality of the 2013 assassination of Colorado's Department of Corrections director, and his threat assessment was made about a year after that assassination. From the standpoint of a coordinate officer in Texas, "that spring of 2014 was a very unsettled and dangerous world," and the "security risks that are inherent in . . . the criminal justice world . . . had escalated in general and specifically over the last number of months." Livingston noted, "At that same time there were specific death threats to me, both just prior to the Executive Director in Colorado's assassination and just shortly after it."

McCraw's threat assessment likewise considered the professor's email, among other things, as establishing a substantial threat of physical harm that is connected to the requested information. McCraw considered the professor's email "to constitute a serious threat" and "indicative of the fervor surrounding the death penalty issue that, in my opinion, may likely lead to violence against the compounding pharmacy if the identity is released." Moreover, McCraw based his assessment on the fact that "the current compounding pharmacy is open to the public and located in an urban area of a Texas city." He further noted that, when researching the Woodlands Pharmacy, he was able to "locate the pharmacy's website and then from open source information [was able to] easily identify and locate the pharmacy's employees and their family members," and public "[p]harmacies are by design easily accessible to the public." Thus, he

23

explained, "Any pharmacy that is located in a city and open to the public is easily accessible and presents a 'soft-target,' meaning it is an easy target for violence, and generally unprotected by significant security measures." "The threat extends beyond those inside the pharmacy itself, because violence that occurs near the pharmacy can injure bystanders as well." Ultimately, McCraw concluded: "If the supplier is identified, there is a substantial . . . threat of physical harm to the pharmacist, employees, customers, or bystanders."

We find the professor's email, as well as the expert testimony from law enforcement personnel, compelling in this instance where the target of threats remains unknown. As we stated in *Cox*, "A certain amount of deference must be afforded DPS officers and other law enforcement experts about the probability of harm." *Cox*, 343 S.W.3d at 119. We agree that the Department met its evidentiary burden in establishing that the requested information—the identity of the source of lethal injection drugs to the State—is protected under the common law exception to mandatory PIA disclosure because there exists a substantial threat of physical harm if the information is made public. Thus, "the public's right to 'complete information' must yield [because] disclosure of that information would substantially threaten physical harm." *Id.* (quoting TEX. GOV'T CODE § 552.001(a)).

### III. Conclusion

Properly construed, *Cox* should have led the court of appeals to credit direct evidence and expert affidavits regarding significant risks of physical harm faced by lethal injection drug suppliers. On this record, the Department is entitled to judgment as a matter of law that the physical-safety exception to the PIA applies to protect the identity of a vulnerable retail

compounding pharmacy from public disclosure.  We reverse the court of appeals' judgment and render judgment for the Department.

_____
Paul W. Green
Justice

OPINION DELIVERED:  April 12, 2019