# Supreme Court of Texas

---

No. 24-0037

---

NuStar Energy, L.P.,

*Petitioner*,

v.

Kelly Hancock, Comptroller of Public Accounts of the State of
Texas; and Ken Paxton, Attorney General of the State of Texas,

*Respondents*

---

On Petition for Review from the
Court of Appeals for the Third District of Texas

---

**Argued September 10, 2025**

JUSTICE DEVINE delivered the opinion of the Court.

Justice Lehrmann did not participate in the decision.

This franchise-tax dispute presents a question of statutory
interpretation: does section 171.103(a)(1) of the Texas Tax Code
attribute sales of tangible personal property to the location the buyer
takes delivery (the place of transfer) or to the location the buyer uses or
consumes the goods (the ultimate destination)? In a suit to invalidate
state comptroller rules making the transfer point determinative, the

taxpayer asserts the regulations are invalid because they conflict with the statute. The taxpayer reads statutory language sourcing sales receipts to Texas when goods are "delivered or shipped *to a buyer in this state*" as referencing the ultimate destination for the goods rather than the place of transfer to the buyer.[1] The lower courts rejected the taxpayer's construction of the Tax Code and upheld the comptroller's rules. We affirm. The statute unambiguously sources receipts from sales of tangible personal property to Texas if the taxpayer yields possession and control of the goods to a buyer at a location in this state even if the buyer subsequently transports those goods to another jurisdiction for consumption or use.

## I

Texas imposes a franchise tax on domestic and foreign entities conducting business in this state.[2] The tax approximates "the value of th[e] privilege to transact business in Texas," including economic benefits like "the opportunity to realize gross income and the right to invoke the protection of local law."[3] An entity's franchise-tax liability is determined by multiplying its "taxable margin" by the applicable tax rate.[4] Determining taxable margin has three steps: (1) calculation of the entity's margin (total revenue minus authorized deductions);

---

[1] *See* TEX. TAX CODE § 171.103(a)(1) (emphasis added).

[2] *Id.* § 171.001(a).

[3] *Hegar v. Am. Multi-Cinema, Inc.*, 605 S.W.3d 35, 38 (Tex. 2020) (alteration in original) (internal quotation marks and citation omitted).

[4] TEX. TAX CODE §§ 171.002, .101.

2

(2) apportionment to Texas; and (3) subtraction of other allowable deductions.[5]  Only apportionment is at issue here.[6]

The Tax Code's single-factor apportionment method is based on the proportion of the taxpayer's total sales attributable to "business done in this state."[7]  This is a "sales-factor" formula that compares the taxpayer's gross receipts from business done in Texas (the numerator) with its gross receipts from its entire business (the denominator).[8]  The resulting percentage, ranging from 0% to 100%, is applied to the entity's margin to determine the taxpayer's apportioned margin.[9]  Because an entity's "franchise-tax liability increases as the ratio of Texas receipts to total receipts increases,"[10] apportioning gross receipts to Texas directly impacts the taxes due.

---

[5] *Id.* § 171.101(a)(1)–(3); *see id.* § 171.1011 (determination of total revenue); *Sirius XM Radio, Inc. v. Hegar*, 643 S.W.3d 402, 404 (Tex. 2022) (discussing the three-step taxable-margin formula).

[6] For a more comprehensive overview of Texas's franchise-tax scheme see, for example, *Graphic Packaging Corp. v. Hegar*, 538 S.W.3d 89, 93 & n.1 (Tex. 2017), and *In re Nestle USA, Inc.*, 387 S.W.3d 610, 614-16 (Tex. 2012).

[7] TEX. TAX CODE §§ 171.103(a), .106(a).  As we observed in *Sirius XM Radio*, "Texas has used a single-factor test based on sales receipts" "[g]oing back to 1919."  643 S.W.3d at 409.  Other states consider factors in addition to sales receipts, typically the taxpayer's payroll and property, and may weight the factors equally or unequally.  *See* Bloomberg Tax, *Executive Summary: 2019 Survey of State Tax Departments* (Tax Management Multistate Tax Report) 19 (2019).

[8] TEX. TAX CODE § 171.106(a).

[9] *Id.*

[10] *Hallmark Mktg. Co. v. Hegar*, 488 S.W.3d 795, 796 (Tex. 2016).

Section 171.103(a) of the Tax Code directs when various categories of commercial receipts are counted as "business done in this state."[11] Relevant here, subsection (a)(1) sources gross receipts from sales of tangible personal property to Texas "if the property is delivered or shipped to a buyer in this state regardless of the FOB point or another condition of the sale."[12] At issue in this rule-validity challenge are administrative rules sourcing gross receipts to Texas when the buyer has taken possession and control of goods in Texas, including Texas waters.[13] The examples provided in the challenged rules attribute gross receipts based on what is often referred to as the "place of delivery" or "place of transfer" to the buyer.

Texas-based NuStar Energy, L.P. sells high-sulfur bunker fuel for use in large, oceangoing ships and delivers that fuel to primarily foreign-registered vessels at Texas ports.[14] For tax years 2011 to 2013, NuStar treated those sales as Texas transactions and paid franchise taxes accordingly. NuStar then requested a $2.4 million tax refund based on a revised apportionment factor that excluded the bunker-fuel sales from

---

[11] *See* TEX. TAX CODE § 171.103(a)(1)–(6) (providing sourcing rules for receipts from sales of goods, services, real-property sales and rentals, royalties, and business generally).

[12] *Id.* § 171.103(a)(1).

[13] *See* 34 TEX. ADMIN. CODE § 3.591(e)(29)(A), (C), (H), (e)(31) (Margin: Apportionment, computation and sourcing of gross receipts).

[14] "Bunker fuel" is used to power oceangoing vessels and their machinery. *See bunker fuel or bunker oil*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, at 297 (2002) [hereinafter WEBSTER'S]; *bunker or bunker oil*, THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE, at 278 (2d ed. 1987) [hereinafter RANDOM HOUSE].

its Texas receipts because the nonresident purchasers do not (and legally cannot) use, sell, or otherwise consume bunker fuel in Texas or Texas waters.[15] NuStar took the position that these "dock sales" were not business done in Texas because the buyers are here only temporarily to take delivery, not to use or consume the goods NuStar has physically delivered to them in this state.[16]

After the refund request was denied, NuStar exhausted administrative remedies and then filed a tax-refund suit against the Texas Comptroller of Public Accounts and the Texas Attorney General (collectively, the Comptroller).[17] NuStar also sought a declaration that administrative rules 3.591(e)(29)(A), (C), and (H) and 3.591(e)(31)[18] are

---

[15] For purposes of the issue on appeal, we take as true NuStar's allegations about the nature of the sales transactions.

[16] "Dock sales" are transactions in which the buyer takes physical possession of goods at the seller's loading dock and provides transportation to remove the goods from the seller's location. *See* Brian Kopp, *Does the Destination Rule Control the Situs of Dock Sales?*, 5 J. MULTISTATE TAX'N 156, 156 (1995).

[17] Kelly Hancock, the interim successor to former comptroller Glenn Hegar, has been substituted as a party. *See* TEX. R. APP. P. 7.2(a).

[18] The court of appeals' opinion sets out the text of the rules in full. 683 S.W.3d 831, 835 (Tex. App.—Austin 2023) (quoting the applicable versions of the administrative rules formerly at 34 TEX. ADMIN. CODE § 3.591(e)(29)(A), (C), (H), (e)(31)). As the court noted, the rules were twice amended in nonmaterial ways during this litigation. *See id.* at 835 n.2. Of note, subsection (e)(31), which defines Texas's maritime boundary, is now numbered as (e)(32). *See* 34 TEX. ADMIN. CODE § 3.591(e)(32); 46 Tex. Reg. 460, 464, 472 (2021) (adopting amendments to rule 3.591, including by "add[ing] new subsection (e)(31)" with subsequent paragraphs "renumbered accordingly"). Unlike the other disputed provisions, this subsection merely establishes the geographical limit in which a sale occurs in Texas waters; it does not include examples of transactions sourcing receipts to Texas. *See* 34 TEX. ADMIN. CODE § 3.591(e)(32).

facially invalid as contrary to section 171.103(a)(1)'s plain language and objectives.[19]

The parties teed up the rule challenge in cross-motions for partial summary judgment joining issue on what it means for goods to be "delivered or shipped to a buyer in this state" under section 171.103(a)(1). According to NuStar, the statute employs a "market-based" or "ultimate-destination" sourcing rule.[20] Under such a rule, sales receipts are attributable to the market for the seller's goods as determined by the destination where the buyer intends to use, sell, or otherwise dispose of the property. NuStar contends that section 171.103(a)(1) must be read in this way because the phrase "in this state" grammatically modifies the words "a buyer," not the words "delivered or shipped." Construing "to a buyer in this state" as describing the buyer's location for use or consumption, NuStar asserts that notwithstanding the transfer of possession and control to a buyer in Texas, goods have not been delivered "to a buyer in this state" if the buyer intends to subsequently transport the goods to an out-of-state location for use, sale, or other disposition.

The Comptroller, by contrast, maintains that the buyer's subsequent transportation or intended use of the goods is irrelevant

---

[19] *See* TEX. GOV'T CODE § 2001.038 (authorizing a declaratory-judgment action to challenge the validity or applicability of an administrative rule).

[20] NuStar has alternatively referred to the controlling location as the "place of market" or "ultimate destination" without intending any distinction between the two. NuStar construes all as referring to the location at which the goods finally come to rest after all transportation has concluded, meaning the location the buyer ultimately places those goods for consumption, use, or storage for resale.

6

under the statute's plain language. Instead, the Comptroller construes the statute as employing a "place of delivery" or "place of transfer" test. According to the Comptroller, "delivered or shipped to a buyer in this state" simply means the seller has [1] physically transferred possession and control [2] to a buyer [3] at a location in Texas. Stated differently, section 171.103(a)(1) fixes the sales situs at the location where the transaction is consummated by the actual transfer of possession and control to the buyer.

The trial court granted the Comptroller's summary-judgment motion, denied NuStar's motion, and declared that the disputed rules are valid. On permissive interlocutory appeal,[21] the court of appeals affirmed, holding that (1) section 171.103(a)(1) unambiguously apportions sales receipts to Texas "[based] on where the buyer received the property, not where the buyer is ultimately located when they plan to use, sell, or otherwise dispose of the property"; and (2) based on a plain reading of the statute, NuStar's rule challenge fails on its fundamental premise.[22]

## II

The proper interpretation of the apportionment statute is a legal question that ultimately settles the parties' dispute about the validity of

---

[21] *See* TEX. CIV. PRAC. & REM. CODE § 51.014(d), (f) (authorizing an appeal from an otherwise unappealable interlocutory order involving a controlling and potentially dispositive question of law).

[22] 683 S.W.3d at 838, 841.

the challenged administrative rules.[23] This is a matter we consider de novo according to well-established and well-known principles.[24]

Neither side has argued that section 171.103(a)(1) determines the sales situs by looking to the origin of a delivery or shipment.[25] Rather, the parties agree the statute employs a destination-based sourcing rule,[26] with both sides viewing the statute as unambiguous in its meaning. They part company, however, on what destination the statute

---

[23] *See* TEX. TAX CODE § 111.002(a) ("The comptroller may adopt rules that do not conflict with the laws of this state or the constitution of this state or the United States for the enforcement of the provisions of this title and the collection of taxes and other revenues under this title."); *Tex. Bd. of Chiropractic Exam'rs v. Tex. Med. Ass'n*, 616 S.W.3d 558, 568-69 (Tex. 2021) (explaining that rule-validity challenges present purely legal questions based on the meaning of the relevant statutes); *Tex. State Bd. of Exam'rs of Marriage & Fam. Therapists v. Tex. Med. Ass'n*, 511 S.W.3d 28, 33 (Tex. 2017) (to overcome the presumption that an administrative rule is valid, the party challenging the rule must show it "(1) contravenes specific statutory language; (2) runs counter to the general objectives of the statute; or (3) imposes additional burdens, conditions, or restrictions in excess of or inconsistent with the relevant statutory provisions").

[24] *See Maxim Crane Works, L.P. v. Zurich Am. Ins. Co.*, 642 S.W.3d 551, 557 (Tex. 2022) (statutory interpretation is a question of law reviewed de novo); *Brazos Elec. Power Coop., Inc. v. Tex. Comm'n on Env't Quality*, 576 S.W.3d 374, 383-84 (Tex. 2019) (setting out typical statutory-construction principles); *Tex. Dep't of Crim. Just. v. Levin*, 572 S.W.3d 671, 680 (Tex. 2019) (a ruling on cross-motions for summary judgment is reviewed de novo).

[25] *See Sirius XM Radio*, 643 S.W.3d at 408-10 (observing that unlike sales of tangible personal property, section 171.103(a)(2) sources receipts from services to the location the service originates); *see also* Jerome R. Hellerstein & Walter Hellerstein, STATE TAXATION ¶ 9.18[1] (3d ed. 2025) (defining an "origin" based sourcing method as attributing sales to the taxing state based on shipment from a location in the state).

[26] Hellerstein & Hellerstein, *supra* note 25, ¶ 9.18[1] (defining a "destination" based sourcing method as referring to "sales shipped into or delivered to customers in the state").

specifies: where the goods are delivered to the buyer or where the buyer consumes or uses the property (if that differs from the transfer point). Though the parties read the statute differently, this disagreement does not render the statute ambiguous,[27] and we agree with the court of appeals that it is not. The text does not embrace NuStar's use-or-consumption construction, which is therefore not a reasonable interpretation of the statute. An alternative reading that has been disclaimed by the parties—sourcing receipts to Texas only when the buyer is a Texas resident or does business in Texas—is equally untenable when section 171.103(a)(1) is considered within the broader statutory context. We therefore agree with the Comptroller that section 171.103(a)(1) employs a "place of delivery" or "place of transfer" test and that the Comptroller's rules, which do the same, are not in conflict.

## A

A party challenging the validity of an administrative rule bears the burden to demonstrate "that the rule's provisions are not in harmony with the general objectives of the act involved, which we discern from the statute's plain text."[28] Starting there, section 171.103(a)(1) provides:

> [I]n apportioning margin, the gross receipts of a taxable entity from its business done in this state is the sum of the taxable entity's receipts from:

---

[27] *See Sw. Royalties, Inc. v. Hegar*, 500 S.W.3d 400, 405 (Tex. 2016) (statutory "language is ambiguous only if the words yield more than one reasonable interpretation").

[28] *Tex. Bd. of Chiropractic Exam'rs*, 616 S.W.3d at 569 (internal quotation marks and citations omitted).

9

> (1) each sale of tangible personal property if the property is delivered or shipped to a buyer in this state regardless of the FOB point or another condition of the sale . . . .[29]

The terms relevant to the present dispute are not defined, so we begin by considering their ordinary meaning as informed by the statutory context.[30]

"Delivered," which always refers to a destination, means to "carry and turn over . . . goods . . . to the intended recipient," to "hand over," and to "yield possession and control."[31] The statute uses "shipped" in the sense of sending or causing something to be transported.[32] This could refer to either an origination point or a destination except that the immediately following word—"to"—confirms that shipping is just an alternative way of effectuating delivery. "To" is a function word indicating movement toward a destination,[33] in this case "a buyer." As

---

[29] TEX. TAX CODE § 171.103(a)(1); *see Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 838-39 (Tex. 2018) (discussing principles of statutory construction).

[30] *Fort Worth Transp. Auth.*, 547 S.W.3d at 838.

[31] WEBSTER'S, *supra* note 14, at 597; RANDOM HOUSE, *supra* note 14, at 528; *accord delivery*, BLACK'S LAW DICTIONARY, at 541 (12th ed. 2024) ("The formal act of voluntarily transferring something; esp., the act of bringing goods . . . to a particular person or place."); *see Epps v. Fowler*, 351 S.W.3d 862, 866 (Tex. 2011) ("Often, we consult dictionaries to discern the natural meaning of a common-usage term not defined by contract, statute or regulation.").

[32] WEBSTER'S, *supra* note 14, at 2096; RANDOM HOUSE, *supra* note 14, at 1766; *accord ship*, BLACK'S LAW DICTIONARY, *supra* note 31, at 1661 ("To send (goods . . .) from one place to another, esp. by delivery to a carrier for transportation.").

[33] WEBSTER'S, *supra* note 14, at 2401; RANDOM HOUSE, *supra* note 14, at 1989.

we explained in *Lockheed Martin Corp. v. Hegar*, "to a buyer" distinguishes the intended recipient of the goods from a mere intermediary who takes possession only to facilitate further transport to the buyer.[34]  And "in this state" obviously refers to a location or place in Texas.[35]  Read syntactically, section 171.103(a)(1) sources sales receipts to Texas when tangible personal property was (1) handed over (2) to a buyer (3) in Texas.  A simple, clear, and objectively determinable sales point.

NuStar, however, says there is much more to it than that because a place-of-transfer sourcing point fails to accurately reflect the seller's market for the goods when the customer intends to subsequently transport the property to its ultimate destination.  Describing the sales-factor formula as generally accounting for the market state's contribution to the seller's revenue,[36] NuStar contends that "to a buyer

---

[34] 601 S.W.3d 769, 775-76 (Tex. 2020) (holding that despite lack of contractual privity between the buyer and seller, the U.S. government, which held privity with both, was a required intermediary under federal law, not the buyer contemplated by section 171.103(a)(1)).

[35] *See in*, WEBSTER'S, *supra* note 14, at 1139 ("a function word to indicate location or position in space"); *in*, RANDOM HOUSE, *supra* note 14, at 964 ("used to indicate inclusion within space, a place, or limits"); *see also ETC Mktg., Ltd. v. Harris Cnty. Appraisal Dist.*, 528 S.W.3d 70, 76 (Tex. 2017) (holding that a state tax implicating interstate commerce applies only to "an activity with a substantial nexus with the taxing state" (citing *D.H. Holmes Co. v. McNamara*, 486 U.S. 24, 30 (1998))).

[36] *Compare Lockheed Martin*, 601 S.W.3d at 777 ("Generally, a sales-factor apportionment formula is intended 'to reflect the contribution of the market state to the taxpayer's income.'" (quoting Hellerstein & Hellerstein, *supra* note 25, ¶ 9.18[3][a] (discussing sourcing revenue from sales of services))), *with Sirius XM Radio*, 643 S.W.3d at 407-08, 409 n.5 (suggesting that the sales-factor formula as adopted in Texas is not always directed to

in this state" plainly requires the taxpayer and the taxing authority to look beyond the transfer point to determine the buyer's location *for the goods*. In comparison to a place-of-transfer rule, the sourcing rule NuStar envisions would give rise to more complex administrative, practical, and recordkeeping burdens related to ascertaining and documenting a buyer's post-acquisition journey to the place of consumption or use.[37] If that is what the statute mandated, so be it.[38] But it does not.

While we can accept NuStar's argument that "in this state" modifies "buyer," the full prepositional phrase "to a buyer in this state" modifies the verb phrase "if the property is delivered or shipped," specifying where the delivery or shipment is taking place to the buyer. If "in this state" were as grammatically constrained as NuStar posits, the action verbs would be mere surplusage. The express condition "if the property is delivered or shipped" would not matter one whit if the decisive inquiry is the location the buyer intends to use or consume the goods. Those words lack any function if the statute means what NuStar

---

capturing the customer market given that receipts from sales of services are sourced to the place services are "performed" not where they are "received" by the customer or their "effects felt").

[37] *See* Hellerstein & Hellerstein, *supra* note 25, ¶ 9.18[1][a][i] (observing that the ultimate-destination rule "introduce[s] time-consuming and burdensome complexities that require vendors to inquire into the course of a product's journey after it is turned over to the customer, the local trucker, or other local recipient").

[38] *See EXLP Leasing, LLC v. Galveston Cent. Appraisal Dist.*, 554 S.W.3d 572, 586 (Tex. 2018) (explaining that the judiciary's role does not include "pass[ing] judgment on the wisdom of the legislature's chosen tax policies").

says. Because we presume the Legislature chose its words with care, we must read the statute to give effect to all its terms and not treat any language as surplusage if possible.[39] Only a point-of-transfer construction does that.

Giving effect to the statute's plain language means that the *outcome* of the sourcing rule may differ depending on whether the buyer has subsequently transported the property to an extraterritorial destination or whether the seller has delivered or shipped the property to the buyer at the same location. But that does not run counter to the statute's admonishment that sourcing is determined "regardless of the FOB point or another condition of the sale."[40] The mode of transportation is not what makes the difference; what matters is the customer's location when the seller surrenders the goods. Different transaction facts often produce different results. Section 171.103(a)(1) instructs that legal technicalities cannot override transaction realities, but this instruction does not mean that transaction facts must be

---

[39] *PlainsCapital Bank v. Martin*, 459 S.W.3d 550, 556 (Tex. 2015).

[40] TEX. TAX CODE § 171.103(a)(1). "FOB," which is an initialism for "free on board," refers to a delivery or shipment term designating the location where a seller is or a buyer becomes responsible for the expense and risk of transporting the goods. *See, e.g.*, TEX. BUS. & COM. CODE § 2.319(a) (defining the term FOB absent an agreement otherwise). A "condition of sale" is a term that must be met for the transaction to be completed. *See Lockheed Martin*, 601 S.W.3d at 777 (defining "condition" as "a circumstance that is essential to the appearance or occurrence of something else" (quoting WEBSTER'S, *supra* note 14, at 473)). Applying the rule of *ejusdem generis*, "another" condition of the sale refers to sales terms sharing similar qualities as an FOB point, which is the immediately preceding statutory term. *See Ferchichi v. Whataburger Rests. LLC*, 713 S.W.3d 330, 338 (Tex. 2025) (explaining the *ejusdem generis* doctrine).

ignored or disregarded just because they might also qualify as conditions of sale.

The broader statutory context could, of course, suggest a different or more precise understanding of enacted language,[41] but not so here. In that regard, the words omitted from the statute are just as telling as those the Legislature adopted.[42] Section 171.103(a)(1) speaks only of delivery and shipment. If the Legislature intended to describe the buyer's domicile, business location, or location for use or consumption of the property, different phrasing would be expected. After all, these are not abstruse concepts that defy clear explication. Yet section 171.103(a)(1) says nothing about the "ultimate" destination of the property the taxpayer sold; the "market" for that property; or the buyer's "consumption," "use," or other "disposition" of the property. In notable comparison, subsection (a)(4) specifically defines "business done in this state" as including "the *use* of a patent, copyright, trademark, franchise, or license *in this state*."[43] Given subsection (a)(4)'s phrasing, it is inexplicable that subsection (a)(1) would be written as it is if the Legislature intended the taxing situs to be determined by the location the buyer intends to use the goods.

Nor would it be reasonable to construe section 171.103(a)(1) as incorporating a residency, domicile, home-state, or place-of-business

---

[41] *Fort Worth Transp. Auth.*, 547 S.W.3d at 838.

[42] *See Union Carbide Corp. v. Synatzske*, 438 S.W.3d 39, 52 (Tex. 2014) ("We take statutes as we find them, presuming the Legislature . . . omitted words it intended to omit.").

[43] TEX. TAX CODE § 171.103(a)(4) (emphases added).

14

destination. Subsection (a)(1) makes no mention of such things. In comparison, when the Legislature imposed a residency limitation elsewhere in Chapter 171, it used clear and specific language to convey that requirement.[44]

The notion that the franchise tax's sales-factor formula does (or should) capture the customer market for the taxpayer's goods comes not from the statute's text but from an unstated policy that may or may not have motivated the Legislature's adoption of section 171.103(a)(1) as part of Texas's franchise-tax scheme. As NuStar points out, the language in subsection (a)(1) is similar (though not identical) to section 16(a) of the Uniform Division of Income for Tax Purposes Act (UDITPA),[45] a model uniform income tax scheme with a three-factor apportionment formula.[46] UDITPA is designed to address the issue of allocating multistate business income among the states having the power to tax at least some portion of that income.[47] This model law has been adopted in varying degrees by a majority of states and has also

---

[44] *See id.* §§ 171.101(a)(1)(B)(ii)(b) ("resident of this state"), .106(b)–(d), (h) ("domiciled in this state," "residents of this state," "domiciled in Texas," and "legal domicile of the [taxpayer's] customer is in this state"), .354 ("resident of this state"); *see also id.* § 171.106(g) ("A receipt from internet hosting . . . is a receipt from business done in this state only if the customer to whom the service is provided is located in this state."); *cf. id.* § 171.109 (using the term "place of business" in relation to a deduction of a taxpayer's relocation costs).

[45] *See* UDITPA § 16(a), 7A U.L.A. 418 (1957).

[46] *See id.* § 9 (describing the model law's three factors of property, payroll, and sales).

[47] *See* Walter Hellerstein, *Construing the Uniform Division of Income for Tax Purposes Act: Reflections on the Illinois Supreme Court's Reading of the "Throwback" Rule*, 45 U. CHI. L. REV. 768, 769 (1978).

been incorporated into article IV of the 1967 Multistate Tax Compact (MTC), which functions as a framework for member states, including Texas, to adopt, modify, or ignore at their discretion.[48] In section 171.103(a)(1), Texas has adopted language similar to UDITPA section 16(a), but our franchise-tax statute—the context in which we read that language—differs in significant ways.[49]

A uniform law will ideally be interpreted and applied in a way that promotes consistency with how other states interpret the same law, but only if it is possible to do so while remaining faithful to the statutory text as understood in the statute as a whole.[50] Here, NuStar would

---

[48] *See* TEX. TAX CODE § 141.001 (Adoption of Multistate Tax Compact); *Graphic Packaging*, 538 S.W.3d at 98-106 (concluding that MTC "member states did not intend for [the UDITPA provisions] to be immutable, binding contractual terms" and holding that it is ultimately Texas law as articulated in chapter 171 that controls); *see also U.S. Steel Corp. v. Multistate Tax Comm'n*, 434 U.S. 452, 457 n.6 (1978) (noting that the MTC, which contains UDITPA in article IV, "allows multistate taxpayers to apportion and allocate their income under formulae and rules set forth in the Compact or by any other method available under state law").

[49] *Compare, e.g.*, UDIPTA, *supra* note 45, §§ 10–18 (adopting an income tax with a three-factor net income apportionment formula that includes a sales-factor element with sourcing rules for two categories of gross receipts and a "throwback" rule sourcing receipts to the origin, rather than the destination, for tangible personal property sales that are not taxable in the location to which property is shipped), *with, e.g.*, TEX. TAX CODE § 171.103 (utilizing a single-factor apportionment formula focusing on gross receipts from doing business in Texas with sourcing rules for six categories of gross receipts without a throwback rule).

[50] *Compare* TEX. GOV'T CODE § 311.028 ("A uniform act included in a code shall be construed to effect its general purpose to make uniform the law of those states that enact it."), *with Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex. 2009) ("Where text is clear, text is determinative of [legislative] intent.").

prefer our statute to be read as encompassing an ultimate-destination theory that alters the ordinary meaning of enacted language. To support that outcome, NuStar finds affirmation in authority from other jurisdictions that have considered the issue presented here. Not all of the cited cases actually decided the issue or construed materially similar language.[51] In several jurisdictions, the issue presented in this case has been addressed under statutes with a provision similar to section 171.103(a)(1), but even then, the authorities are not uniform in their conclusions.[52]

---

[51] *See, e.g.*, *Corp. Exec. Bd. Co. v. Va. Dep't of Tax'n*, 822 S.E.2d 918, 921 (Va. 2019) (involving services and intangibles under a differently worded statute); *Powerex Corp. v. Dep't of Revenue*, 346 P.3d 476, 483-84 (Or. 2015) (expressly declining to take a position on the matter); *Lone Star Steel Co. v. Dolan*, 668 P.2d 916, 920 (Colo. 1983) (holding only that transfer in the taxing state was to an intermediary, not the buyer).

[52] *Compare Hercules, Inc. v. Utah State Tax Comm'n*, 877 P.2d 133, 136 & n.5 (Utah 1994) (rejecting "the destination rule" to source receipts from a sale of goods completed in Utah even though the product was destined to be used outside the state of delivery by incorporation into the buyer's end-product: "The statute does not use the term 'consumption,' and the location of consumption of the goods cannot be read into the statute to defeat its plain language."), *and Miss. State Tax Comm'n v. Murphy Oil USA, Inc.*, 933 So. 2d 285, 292 (Miss. 2006) (applying an "entirety of events" sourcing rule that depends on "what is being done in the state" "in each unique instance"), *with McDonnell Douglas Corp. v. Franchise Tax Bd.*, 33 Cal. Rptr. 2d 129, 133 (Ct. App. 1994) (explicitly rejecting the place-of-delivery rule); *compare also, e.g.*, *Pabst Brewing Co. v. Wis. Dep't of Revenue*, 387 N.W.2d 121, 123 (Wis. Ct. App. 1986) (holding that the buyer's business location controlled), *with Dep't of Revenue v. Parker Banana Co.*, 391 So.2d 762, 763-64 (Fla. Dist. Ct. App. 1980) (holding that the destination of the goods controlled, regardless of the buyer's business location), *superseded by* FLA. STAT. § 220.15(5)(b)(1) (amending statute to make delivery or shipment "to a purchaser within this state" determinative "regardless of the . . . ultimate destination of the property, unless shipment is made via a common or contract carrier"); *see Powerex*, 346 P.3d at 483 (observing that "[a]greement is not universal" regarding whether

We acknowledge that there may be some tension between our holding today and decisions from other jurisdictions that have reached contrary conclusions about very similar language.[53] But substantial variations among state taxing regimes reduce uniformity and diminish consistency concerns.[54] In any event, what is determinative here—and most important—is that our statute's plain language trumps unstated policy objectives that might be gleaned from extratextual sources.[55] We will not work backwards from an unspoken purpose or rely on extrinsic

UDITPA's sales-factor provision "embod[ies] an ultimate-destination theory of sales apportionment"); *Olympia Brewing Co. v. Comm'r of Revenue*, 326 N.W.2d 642, 646 (Minn. 1982) ("At best, the authorities cited by the parties indicate that there is not a unanimity of opinion as to the meaning of the phrase 'within this state' in section 16 of UDITPA."); *see also* Hellerstein & Hellerstein, *supra* note 25, ¶ 9.18[1][a][i] ("UDITPA, at least as construed by the Multistate Tax Commission (MTC), attributes sales to the state in which they are 'delivered . . . to a purchaser,' whether or not that is the ultimate destination of the goods.").

[53] *See, e.g.*, *Commonwealth v. Gilmour Mfg.*, 822 A.2d 676, 677-78, 684 (Pa. 2003).

[54] *See* Hellerstein & Hellerstein, *supra* note 25, ¶ 9.21 ("[T]he statutory variations among the 'uniform' provisions of UDITPA states are rampant; judicial construction of identical language can vary from state to state; and administrative regulations and practices among states are often inconsistent."); *see also id.* ¶ 9.18 (providing a chart that gives a flavor of the variances among state sourcing rules governing receipts from the sale of tangible personal property).

[55] *See Tex. Health Presbyterian Hosp. of Denton v. D.A.*, 569 S.W.3d 126, 136 (Tex. 2018) (explaining that, in fulfilling the judiciary's duty to construe statutes, "we do not consider . . . extrinsic aides to interpret an unambiguous statute because the statute's plain language most reliably reveals the legislature's intent"); *In re Allcat Claims Serv., L.P.*, 356 S.W.3d 455, 467 (Tex. 2011) ("The language is not ambiguous and, as such, opinions from . . . other sources cannot override the text approved by the Legislature.").

18

sources to inject (and then resolve) ambiguity when, as here, the text is clear.

Perhaps the Legislature prefers uniformity across jurisdictions as to the taxing situs for tangible personal property sales. Only the Legislature has the prerogative to determine whether uniformity is the ideal and, if so, whether the benefits of uniformity outweigh any disadvantages of excluding transactions like dock sales from the reach of our state's franchise tax. But if our application of the statute's plain language puts Texas out of step with other states, the remedy is legislative, not judicial. The judiciary's role is not to determine what the policy is or to provide a fix if statutory language does not unfailingly achieve presumed policy goals.[56] Our duty is to enforce what the Legislature has committed to writing. As we have reiterated many times, including in our most recent franchise-tax opinion, we take statutes as we find them without adding or subtracting "to achieve an

---

[56] *See Tex. Health*, 569 S.W.3d at 137 (stating that if the Legislature has mistakenly enacted unambiguous language that "does not accurately reflect its collective intent," "our duty is to fairly construe and apply the language enacted and leave it to the [L]egislature to correct its own errors or omissions [if any]"); *EXLP Leasing*, 554 S.W.3d at 580 (whether "the *outcome* is unfair . . . is a concern beyond our purview," so "we decline to usurp legislative authority by issuing reform diktats from on high" (internal quotation marks and citation omitted)); *In re Dep't of Fam. & Protective Servs.*, 273 S.W.3d 637, 645 (Tex. 2009) ("[I]t is not for courts to decide if . . . particular provisions of statutes could be more effectively worded . . . ."); *see also McLane Champions, LLC v. Hou. Baseball Partners LLC*, 671 S.W.3d 907, 918 (Tex. 2023) ("[J]udicial policy preferences should play no role in statutory interpretation."); *cf. BankDirect Cap. Fin., LLC v. Plasma Fab, LLC*, 519 S.W.3d 76, 86 (Tex. 2017) ("[O]ur 181 legislators—who may have had 181 different motives, reasons, and understandings—nowhere codified an agreed purpose.").

unstated purpose."[57] But that is exactly what would have to happen to make section 171.103(a)(1) provide a sourcing rule based on something other than the point of transfer to the buyer. Accordingly, we reject NuStar's ultimate-destination interpretation, which is atextual and contradicts the statute's plain language. It follows then that NuStar's rule-validity challenge, which is premised on an invalid construction of the statute, fails to overcome the presumption that the Comptroller's rules are valid.[58]

**B**

NuStar's complaints about the Comptroller's rules are threefold. First, the rules transpose statutory text in ways that decouple "in this state" from "a buyer."[59] Second, the rules generally impose a place-of-delivery test that sources receipts based on where the seller transfers possession or control of the property to the buyer. Third, the rules treat the taxpayer's delivery to a purchaser in Texas differently

---

[57] *BankDirect Cap. Fin.*, 519 S.W.3d at 87 (internal quotation marks and citation omitted); *see Sirius XM Radio*, 643 S.W.3d at 408 (even when statutory text is difficult to apply, "it should not be replaced by words of limitation or expansion not chosen by the Legislature").

[58] *See Tex. State Bd. of Exam'rs of Marriage & Fam. Therapists*, 511 S.W.3d at 33.

[59] *Compare* TEX. TAX CODE § 171.103(a)(1) ("delivered or shipped to a buyer in this state"), *with* 34 TEX. ADMIN. CODE § 3.591(e)(29)(A) ("the sale of tangible personal property that is delivered in Texas to a purchaser"), (C) ("the sale and delivery in Texas of tangible personal property that is loaded into a . . . means of conveyance that the purchaser of the property leases and controls or owns"), (H) ("the drop shipment of tangible personal property in Texas," meaning a direct shipment from the seller "to a purchaser's customer, at the request of the purchaser, without passing through the hands of the purchaser").

from delivery to a common carrier in Texas, thereby creating a special "carve out" for extraterritorial transportation by common carrier.[60]

We start with the "core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate."[61] "Where a statute's language carries a plain meaning, the duty of an administrative agency is to follow its commands as written, not to supplant those commands with others it may prefer."[62] An agency's power to execute the law "does not include a power to revise clear statutory terms."[63] Indeed, "the need to rewrite clear provisions of [a] statute" will often be an indication that the agency has "taken a wrong interpretive turn."[64] NuStar is therefore correct to be skeptical of the Comptroller's curious decision to transpose the text by converting the statute's words, "delivered . . . to a buyer in this state," into the rules' words, "delivered in Texas to a purchaser" and like

---

[60] *Compare* 34 TEX. ADMIN. CODE § 3.591(e)(29)(A) ("Delivery is complete upon transfer of possession or control of the property to the purchaser, an employee of the purchaser, or transportation vehicles that the purchaser leases or owns."), *and id.* § 3.591(e)(29)(C) (Texas gross receipts result from "the sale and delivery in Texas of tangible personal property that is loaded into a . . . means of conveyance that the purchaser of the property leases and controls or owns"), *with id.* § 3.591(e)(29)(C) ("The sale of tangible personal property that is delivered in Texas to an independent contract carrier, common carrier, or freight forwarder that a purchaser of the property hires [does not result in a Texas sale] if the carrier transports or forwards the property to the purchaser outside this state.").

[61] *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014).

[62] *SAS Inst. Inc. v. Iancu*, 584 U.S. 357, 363 (2018).

[63] *Util. Air Regul. Grp.*, 573 U.S. at 327.

[64] *Id.* at 328.

21

verbiage. If that transposition worked a substantive change in the statute's operation, NuStar's position would have considerable force.

But in this case, the transposition does not appear to make any substantive difference. Under a proper construction of section 171.103(a)(1), the examples in the Comptroller's rule are ultimately consistent with the statute's place-of-transfer sourcing rule. As NuStar points out, the disputed subsections of the Comptroller's rule are written as attributing receipts to Texas when goods are "delivered in Texas to a buyer" rather than "delivered to a buyer in Texas." But under either phrasing, the destination is the same—the location the buyer took possession or control of the goods. Transposition of the statutory language would be problematic—or rather, more problematic—if the examples addressed *shipments* to a buyer because, as discussed above, "shipment in Texas to a buyer" would provide an origination-based sourcing rule instead of the destination-based sourcing rule section 171.103(a)(1)'s language and grammatical structure dictate. But the examples in the Comptroller's rules do not source receipts from shipments made in Texas to destinations outside of Texas. Quite the opposite. What NuStar characterizes as a "carve out" for in-state delivery to a common carrier for out-of-state delivery actually describes a shipment to a buyer outside this state, and this distinction acknowledges that a sale is not consummated for franchise-tax purposes merely by placing the goods in an intermediary's hands. The Comptroller's rules thus survive NuStar's challenge—not because the transposition was wise or warranted, but because NuStar has not shown that it substantively altered the controlling statute's plain command

that a Texas sale results only from delivery or shipment "to a buyer in this state."

### III

Under section 171.103(a)(1)'s unmistakably clear language, goods are delivered in the statutory sense where the buyer receives them in the actual sense. Because the challenged administrative rules are consistent with section 171.103(a)(1) as written, NuStar failed to overcome the presumption that the rules are valid. We therefore agree with the lower courts that those regulations withstand the taxpayer's validity challenge. The court of appeals' judgment is affirmed, and the case is remanded to the trial court for further proceedings consistent with this opinion.

John P. Devine
Justice

**OPINION DELIVERED:** March 13, 2026